**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| CHARLES M. IVEY, III, Trustee for<br>The Carolina Golf Development<br>Company, | )<br>)<br>) | |
| | ) | |
| Plaintiff, | ) | 1:17CV439 |
| v. | ) | |
| | ) | |
| ANDREW C. LYNCH, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter began in Moore County, North Carolina when The Carolina Golf Development Company ("the Debtor") sued 71st Partners, LLC ("71st Partners") challenging the sale of real property. 71st Partners moved to dismiss the complaint, but before the motion was heard, one of the Debtor's creditors initiated an involuntary bankruptcy proceeding and the state court case was removed to the United States Bankruptcy Court for the Middle District of North Carolina. There, 71st Partners filed a third-party complaint against Defendant Andrew Lynch and his law firm, after which Plaintiff Charles M. Ivey, III ("Trustee") amended its complaint to add claims against Lynch. Lynch moved to dismiss the claims against him, in part based on immunity from suit, for which the Bankruptcy Court held hearings on at least two occasions.[1] During those hearings, the question arose as

---

[1] In the meantime, the Bankruptcy Court approved a settlement between the Trustee and 71st Partners, and 71st Partners dismissed without prejudice its Third-Party Complaint against Lynch and his law firm.

to that court's authority to make a jurisdictional determination as to Lynch. After a hearing before this Court, the reference to the Bankruptcy Court was withdrawn, and the Trustee's action against Lynch has, consequently, found its way here.

Before the Court are Lynch's Motion to Dismiss the Amended Complaint and Cross Complaint [Doc. #5-1], initially filed in the Bankruptcy Court, and the Trustee's Motion Seeking Authority to Amend Complaint [Doc. #19]. In opposition to the Trustee's motion to amend, Lynch argues that such an amendment would be prejudicial and futile, (see Def.'s Br. in Opp'n [Doc. #21]), and relies in large part on the same arguments advanced in support of his motion to dismiss the Amended Complaint, (compare id. with Def.'s Supporting Mem. [Doc. #5-1[2]]). For the reasons explained below, the Trustee's motion is denied and Lynch's motion is granted.

I.

On March 9, 2012, the Insolvency Court of Hannover, Germany ("Insolvency Court") commenced an insolvency proceeding over the assets of Ingolf Boex, a German resident, and appointed Dr. Christian Willmer as permanent insolvency administrator. (Decl. of Andrew C. Lynch (Ex. 1 of Def.'s Supporting Br.) ¶ 2; Order of Dist. Ct. of Hannover (Mar. 9, 2012) (Ex. A to Lynch Decl.) [Doc. #5-1[3]

---

[2] Lynch filed his motion to dismiss and its supporting brief with the Bankruptcy Court as one document. Throughout this Opinion, page numbers from Doc. #5-1 are also cited for ease of reference to specific material Lynch filed in support of his motion to dismiss.
[3] In support of his motion to dismiss, Lynch filed his own declaration with attachments and the declaration of H. Philipp Esser with attachments. Several of

2

at 27-36]).) In so doing, the Insolvency Court forbade Boex from availing himself of his assets during the pendency of the proceedings and transferred "[t]he power" "to the insolvency administrator." (Order of Dist. Ct. of Hannover.) The Insolvency Court then entered an order certifying that Willmer, as the insolvency administrator over the property of Boex and under German law, had "full powers to take possession, make use of and realize all and any items of property of the debtor and [to] do so world-wide." (Ct. Order (Mar. 7, 2013) (Ex. D to Decl. of H. Philipp Esser[4]) [Doc. #5-1 at 81-84].)

In May 2012, Willmer, in his role as insolvency administrator, engaged Liles Parker, LLC, and Lynch, a Washington, D.C. partner in the firm, to represent and aid him with respect to Boex's estate located in the United States. (Lynch Decl. ¶¶ 1, 3.) On September 25, 2014, as "insolvency administrator of Ingolf Boex, acting as controlling shareholder . . . pursuant to his appointment as insolvency administrator under authority of Court Order", Willmer executed a Resolution of Controlling Shareholder of The Carolina Golf Development Company and Carolinas Corporation ("Resolution") for the purpose of selling to 71st Partners the Carolina Golf Course owned by The Carolinas Golf Development Company. (Id. ¶ 4.) The Resolution explains that Willmer "was appointed by" the Insolvency Court "as

---

the attachments are English translations of court orders, corporate documents, and the German Insolvency Code. The Trustee neither acknowledges nor challenges the contents, authenticity, or accuracy of any of the attachments.

[4] Lynch apparently intended to attach this March 7, 2013 court order to his own declaration as Exhibit B. (See Lynch Decl. ¶ 2.) While there are exhibits labeled A-D attached to his declaration, none appears to be the March 7, 2013 order.

3

insolvency administrator with full authority to take possession and control of the assets of Dr. Ingolf Boex". (Resolution (Ex. B[5] to Lynch Decl.) [Doc. #5-1 at 38-39].) As part of the Resolution, Wilmer appointed and designated Lynch as a Vice President of The Carolina Golf Development Company "for the limited purpose of executing and delivering the Purchase Agreement Documents" and as "the sole officer . . . having legal authority to execute and deliver such Purchase Agreement Documents". (Lynch Decl. ¶ 4; Resolution.) Lynch was "authorized and directed to take all actions necessary or appropriate to carry out the foregoing resolution[]." (Resolution.)

On October 9, 2014, Willmer authorized the execution of a Purchase Agreement between The Carolina Golf Development Company and 71st Partners for the Carolina Golf Course. (Lynch Decl. ¶ 5.) At Willmer's direction, Lynch executed certain necessary closing documents, including the Special Warranty Deed and the Seller's Closing Certificate, in connection with his representation of Willmer and pursuant to Lynch's limited purpose authority. (Id. ¶ 6.) On behalf of The Carolina Golf Development Company, Lynch signed each document as "Vice President and Authorized Representative, acting at the direction of Dr. Christian Willmer". (Special Warranty Deed (Ex. A to Third-Party Compl.) [Doc. #5-1 at 89-93]; Seller's Closing Certificate (Ex. B to Third-Party Compl.) [Doc. #5-1 at 94].) The Special Warranty Deed was further notarized as Lynch having "personally

---

[5] Lynch cites this as Exhibit C.

4

appeared before [the notary] and acknowledged that he is Vice President and Authorized Representative, acting at the direction of Dr. Christian Willmer of The Carolina Golf Development Company . . . and that he, as Vice President and Authorized Representative, acting at the direction of Dr. Christian Willmer, being authorized to do so," executed the deed. (Special Warranty Deed.)

At the close of the sale, Willmer himself executed a Closing Certificate in his capacity as "insolvency administrator for Ingolf Boex in the proceeding 903 IN 83/12 -6 in the District Court of Hannover Germany ('Insolvency Proceeding')". (Lynch Decl. ¶ 10; Closing Certificate (Ex. D to Lynch Decl.) [Doc. #5-1 at 47-48].) The Closing Certificate goes on to state, in part, that "[p]ursuant to the Insolvency Proceeding," Willmer has "legal authority to sell assets of Ingolf Boex wherever located" and "to sell and/or vote corporate shares owned or controlled by Ingolf Boex, including the corporate shares of Seller". It also notes that "[t]he sale of the Property under the Purchase Agreement has been brought before the board of creditors in the Insolvency Proceeding". (Closing Certificate.)

II.

It is this very sale that began the litigation in Moore County, and it is Lynch's role in that sale that has brought the matter before this Court. In the Amended Complaint, the Trustee asserted against Lynch claims of unjust enrichment, fraudulent transfer, and, in the alternative, breach of fiduciary duty.[6]

---

[6] Characterized as the "Second Claim for Relief" is also a request "Denying any Equitable Relief for Defendants as it Relates to Said Real Property", but this is not

5

(Am. Compl. & Cross-Compl. [Doc. #5].) In response, Lynch has asserted, among other arguments, that he is protected from this suit by common law foreign official immunity.

Although the Supreme Court determined in Samantar v. Yousuf, 560 U.S. 305, 308 (2010), that the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1330, 1602 et seq., "does not govern the determination of" a foreign official's immunity from suit, the Court recognized that such a suit "may still be barred by foreign sovereign immunity under the common law", id. at 324. After the Court's decision, the Fourth Circuit Court of Appeals revisited the question of whether a foreign official was immune from suit under the common law. Yousuf v. Samantar, 699 F.3d 763 (2012). In so doing, the court explained that immunity from "claims arising out of . . . official acts while in office" – often referred to as conduct-based immunity – "derives from the immunity of the State". Id. at 774.

> The doctrine of the imputability of the acts of the individual to the State . . . in classical law . . . imputes the act solely to the state, who alone is responsible for its consequence. In consequence any act performed by the individual as an act of the State enjoys the immunity which the State enjoys.

Id. (ellipses in original). As the court acknowledged,

> By the time the FSIA was enacted, numerous district courts had embraced the notion stemming from international law, that '[t]he immunity of a foreign state . . . extends to . . . any . . . public minister, official, or agent of the state with respect to acts performed in his official capacity if the effect of exercising jurisdiction would be to enforce a rule of law against the state.

---

a claim against Lynch for which relief can be granted and the Trustee removed this purported claim from its proposed Second Amended Complaint.

Id. (quoting Restatement (Second) of Foreign Relations Law § 66(f) (1965) ("the Restatement")) (ellipses in original). While these earlier expositions on foreign official immunity "almost all involved the erroneous (pre-Samantar) application of the FSIA to individual foreign officials claiming immunity", "these decisions are instructive for post-Samantar questions of common law immunity." Id.

This conduct-based, common law foreign official immunity applies to suits where "(1) the actor [is] a public minister, official, or agent of the foreign state; (2) the act [has] been performed as part of the actor's official duty; and (3) exercising jurisdiction would have the effect of enforcing a rule of law against the foreign state." Lewis v. Mutond, 258 F. Supp. 3d 168, 172 (D.D.C. 2017) (citing § 66(f) of the Restatement). Here, the first step is to determine if Willmer, at whose direction Lynch acted, is himself protected by foreign official immunity, the analysis of which begins with a basic explanation of German insolvency proceedings.

## A.

Pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, when a court determines a matter of foreign law, it "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." See, e.g., World Fuel Servs. Trading, DMCC v. Hebei Prince Shipping Co., Ltd., 783 F.3d 507, 518-19 (4th Cir. 2015) (affirming the district court's application of Greek law which was based, in part, on

"submitted declarations from Greek attorneys stating their respective opinions on" relevant Greek law); Basch v. Westinghouse Elec. Corp., 777 F.2d 165, 170 (4th Cir. 1985) (reviewing conclusions by retained experts on Iranian law); Burke v. Practical Concepts, Inc., 717 F.2d 938, 941 n.3 (4th Cir. 1983) (supporting its conclusion as to the application of Bolivian law with the opinions of two Bolivian lawyers).

Here, while the Trustee has neither submitted support for or against nor argument about the application of German insolvency law, Lynch attached to his motion the declaration of H. Philipp Esser, Ph.D., a German attorney admitted to the bar in Germany and the State of New York. (Esser Decl. ¶ 1 [Doc. #5-1 at 49-57].) He studied at the Universities of Tübingen and Leipzig, holds a Ph.D. in law, and received an L.L.M. from the University of Chicago Law School. (Id.) He is a director in the law firm Schultze & Braun, "Germany's largest insolvency law firm (by appointments as insolvency administrator for corporate insolvencies)", where he specializes in insolvency law, "particularly in German-American cross-border insolvencies, financial instruments in insolvency and distressed M&A." (Id.) He "regularly represent[s] insolvency administrators appointed by the German courts and other participants in insolvency proceedings in Germany and abroad." (Id.) He has provided information based on his personal knowledge as well as information "derived from documents or information [he] obtained or that was supplied to [him] by" Lynch's representatives. (Id.)

German insolvency law is governed by the Insolvency Code of October 5, 1994, as amended ("InsO"). (Esser Decl. ¶ 3 [Doc. #5-1 at 49-57].) An insolvency proceeding begins with the filing of an insolvency petition with the insolvency court. (Id. ¶ 4.) "The purpose of insolvency proceedings is the collective satisfaction of the debtor's creditors through realization of the debtor's assets and distribution of the proceeds . . . ." (InsO § 1 (Ex. B to Esser Decl. [Doc. #5-1 at 60-77[7]].) "Upon the filing of the insolvency petition, the preliminary insolvency proceeding . . . begins." (Esser Decl. ¶ 4.) During this time, the insolvency court reviews the matter and, "[i]f the requirements for the commencement of an insolvency proceeding are met, the insolvency court formally opens the case with the commencement order and appoints a (permanent) insolvency administrator." (Id. (citing InsO §§ 16-19, 26, 27).)

"The insolvency administrator is subject to the supervision of the insolvency court" which can "impose a penalty payment" on him if, after a warning, he does not fulfill his "duties" and can ultimately "remove the insolvency administrator from office for good cause." (InsO §§ 58, 59.)

Once insolvency proceedings are commenced, "the right of the debtor to manage and dispose of the assets of the insolvency estate vests in the insolvency

---

[7] Exhibit B to Esser's Declaration is entitled, "Relevant Provisions of the Germany Insolvency Code", and provides the self-described "relevant" provisions both in German and in English. The source of the translation is unknown, unlike the certifications provided with other translated documents, but, as noted above, the Trustee does not challenge the content or the accuracy of the translations.

9

administrator." (InsO § 80.) "Following the report meeting[8], the insolvency administrator shall realise the assets forming the insolvency estate without delay . . . ." (InsO § 159.) "As a result of these provisions, under German law", an insolvency administrator "has the right to exercise full control over any of the assets of [the debtor] that belong to the insolvency estate (excluding only personal assets exempted from enforcement or released to the debtor because of lack [of] value), including the right to vote stocks owned by the debtor." (Esser Decl. ¶ 8.) "These rights extend to property wherever located." (Id.)

The "insolvency court may establish a creditors' committee" whose "members . . . shall support and supervise the insolvency administrator in the execution of his/her office." (InsO §§ 67, 69.) If the insolvency administrator "wishes to undertake legal acts that are of particular importance for the insolvency proceedings", (InsO § 160), such as, for example, the sale of "the business of the debtor as a whole" or "real estate of the bankruptcy estate without a bidding procedure", or the settlement of "a legal dispute with a significant value", (Esser Decl. ¶ 7), he "must obtain the consent of the creditors' committee", (InsO § 160). If the insolvency administrator violates this duty, he may be liable to creditors, but "the relevant transaction is legally valid even without the necessary approval". (Esser Decl. ¶ 7 (citing InsO § 164).)

---

[8] It is unclear to what the "report meeting" refers, because the preceding code section is not included in the self-described relevant portions.

10

The insolvency court convenes and chairs the creditors' meeting, which the insolvency administrator can request and, if so, it "shall be convened". (InsO § 74-76.) For example, while the decision to sell an asset of the insolvency estate "is left to the sole discretion of the insolvency administrator", he "will generally consult with the insolvency creditors in the creditors' committee or in the creditors' meeting". (Esser Decl. ¶ 9.) "The creditors' meeting is [also] entitled to request specific information and a status and management report from the insolvency administrator". (InsO § 79.)

"Under the prevailing legal view, the insolvency administrator is considered to be a court-appointed office holder" with "certain [transferred] judicial sovereign powers", his "task is official in nature with judicative authority", and he "serves a public purpose or public function." (Esser Decl. ¶ 5 (citing German Constitutional Ct., order of Jan. 12, 2016 – 1 BvR 3102/13 (NJW 2016, 930, ¶ 45); Sternal, in: K. Schmidt, Insolvenzordnung – Kommentar, 19th ed. 2016, s. 80 margin note (mn.) 19).)

An insolvency administrator "has the sole authority to appoint legal counsel to assist the insolvency administration and to protect the legal interests of the insolvency estate." (Id. ¶ 10.) It is considered "common and good practice" for an insolvency administrator to retain "foreign legal counsel in connection with a sale of property located abroad and governed by the laws of a country other than that of the insolvency proceeding, unless the property does not have a significant value." (Id.) This engagement usually "includes the designation of counsel to

11

negotiate on behalf of the insolvency administrator and to act as an authorized signatory." (Id.)

Applying these principles here, Willmer is an official or agent of Germany. The Insolvency Court appointed him insolvency administrator of the assets of Boex's insolvency estate. With that court appointment, Willmer received certain judicial sovereign powers to act, and those acts are, therefore, official in nature. Under the prevailing legal view in Germany, he is considered to be a court-appointed office holder. As such, he has the right to exercise full control over any of Boex's assets that belong to the insolvency estate, no matter where in the world they are located. The Insolvency Court explicitly specified such authority in its additional order in which it said that, as insolvency administrator "under the law in Germany", Willmer has full powers to take possession, make use of, and realize all of Boex's property and to do so world-wide. The Insolvency Court supervises his work, as does the court-created creditors' committee before which the sale of the real property at issue was brought.

Willmer's conduct relevant to this action was part of his official duties as insolvency administrator. He retained Lynch and his firm, as is the usual practice of a German insolvency administrator tasked with the sale of assets outside of Germany. As part of his responsibility to take possession and control of and realize Boex's assets, he executed the Resolution, the language of which makes abundantly clear the role in which Willmer was acting. It explains that "the Insolvency Proceeding 903 IN 83/12 -6 has not been concluded" and that Willmer

12

"was appointed by" the Insolvency Court "as insolvency administrator with full authority to take possession and control of the assets of Dr. Ingolf Boex ('Debtor') which include the shares of CGDC and CC". Further, "the Insolvency Administrator desires that CGDC sell the Carolina Golf Course" and has accordingly "adopted this Resolution in order to authorize the legal and valid execution, delivery and performance of the Purchase Agreement Documents", takes "possession and control of the Debtor's share ownership", and "exercises control of CGDC . . . in connection with the closing of the sale of the Carolina Golf Course pursuant to the authority granted by the [Insolvency Court] in said insolvency proceeding". Finally, Willmer executed the Resolution as "insolvency administrator of Ingolf Boex, acting as controlling shareholder of CGDC and CC pursuant to his appointment as insolvency administrator under authority of Court Order[9]".

Willmer's execution of the Closing Certificate was also part of his official duties, as is evident from the language of that document. It notes that he "is insolvency administrator for Ingolf Boex in the proceeding 903 IN 83/12 -6 in the District Court of Hannover Germany" which "has not been terminated and continues" and that, "[p]ursuant to the Insolvency Proceeding", he "has legal authority to sell assets of Ingolf Boex wherever located" and "to sell and/or vote corporate shares owned or controlled by Ingolf Boex". It further provides that, as

---

[9] The translation of the Resolution's signature line apparently incorrectly dates the Court Order as July 3, 2013, rather than March 7, 2013, as has been described elsewhere.

13

insolvency administrator, he approves the Purchase Agreement and the sale of the property which was brought before the board of creditors in the Insolvency Proceeding and for which any necessary approval had been obtained. Finally, he executed the Closing Certificate "in his capacity as insolvency administrator of Ingolf Boex."

B.

The next issue is whether Lynch derives any immunity from Willmer. Lynch argues that, according to the Fourth Circuit Court of Appeals in <u>Butters v. Vance Int'l, Inc.</u>, 225 F.3d 462 (2000), "foreign official immunity extends to the private, domestic agents of foreign officials". (Supporting Mem. at 12.) In response, the Trustee does not acknowledge <u>Butters</u> and, instead, quotes <u>Yousuf</u>, 699 F.3d at 777[10], in support of its argument that Lynch is not immune because he is a United States citizen, and further argues that he was not acting on behalf of Germany, but on behalf of a private individual from Germany, as well as on behalf of the Debtor. (Pl.-Tr.'s Resp. in Opp'n at 6-8 [Doc. #5-2].) The excerpt from <u>Yousuf</u> on which the Trustee relies is from the portion of the opinion addressing the United States Department of State's response to claims of immunity by Samantar, a former high-ranking government official in Somalia – presently a legal permanent resident of the United States – allegedly responsible for the torture, arbitrary detention, and extrajudicial killings of the plaintiffs or their families, whose alleged actions violated

---

[10] The Trustee incorrectly cites page 767 of the opinion.

14

just cogens norms of international law, and whose former state had no then-recognized government from which immunity would flow. See 699 F.3d at 766, 777. Not only are the facts of Yousuf too distinct from those of the instant action, but neither Lynch nor the Court requested an opinion from the State Department and, even had such a response been provided, such an opinion on conduct-based immunity is not controlling. Id. at 773.

Much more informative is the court's opinion in Butters where the plaintiff brought suit against her employer for discrimination. 225 F.3d at 464. Butter's employer, Vance International ("Vance"), was hired by Saudi Arabia to provide security to a member of the royal family at her residence in the United States. Id. When Vance recommended that Butters be assigned to the command post, Saudi military officials stationed at the residence rejected the recommendation as "unacceptable under Islamic law". Id. They considered it inappropriate for Saudi officers to spend long periods of time in the command post with a woman and were concerned about political ramifications at home for the royal family. Id. After repeated rejection, Vance's detail leader informed Butters "that because of the Saudi decision, [she] could not be assigned a rotation in [the residence's] command post" after which she quit and sued Vance for gender discrimination. Id.

According to the court, because "Vance was following Saudi Arabia's orders not to promote Butters, Vance [was] entitled to derivative immunity under the

15

FSIA[11]." Id. at 466. It is "well-settled law that contractors and common law agents acting within the scope of their employment for the United States have derivative sovereign immunity." Id.

> It is but a small step to extend this privilege to the private agents of foreign governments. All sovereigns need flexibility to hire private agents to aid them in conducting their governmental functions. This is especially true for foreign sovereigns given their lack of human resources while operating within the United States. To abrogate immunity would discourage American companies from entering lawful agreements with foreign governments and from respecting their wishes even as to sovereign acts.

Id.

Here, as is common practice in German insolvency proceedings, Lynch was "appointed and designated by Dr. Willmer as a Vice President of CGDC for the limited purpose of executing and delivering the Purchase Agreement Documents" and "authorized and directed [by Willmer] to take all actions necessary or appropriate to carry out the [Resolution]". In this limited capacity, he executed the Special Warranty Deed and Seller's Closing Certificate "acting at the direction of Dr. Christian Willmer".

Finally, denying Lynch immunity and ultimately determining the merits of the claims against him would have the effect of enforcing a rule of law against Germany. Its insolvency proceedings are governed by the Insolvency Code according to which Willmer was appointed insolvency administrator, the Insolvency

---

[11] Although this case was decided under FSIA, it is "instructive for post-Samantar questions of common law immunity." Yousuf, 699 F.3d at 774.

16

Court delegated authority to him, and Willmer pursued the assets of Boex's insolvency estate which the creditors' committee oversaw and apparently approved. A decision that Lynch acted without proper authority necessarily, under these facts, means that Willmer did the same. In turn, such a determination calls into question the actions of the Insolvency Court and its creditors' committee.

In sum, because Willmer is found to be protected by foreign official immunity, so, too, is Lynch, as his agent in the United States, whose conduct relevant to this action was at the direction of Willmer and against whom any decision would have the effect of enforcing a rule of law against Germany. Because it is determined that Lynch is immune from this suit based on common law foreign official immunity, it is not necessary to address his other challenges to the claims against him.

III.

Leave to amend a complaint should be "freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). However, a district court may deny a motion to amend "when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would [be] futile." Laber v. Harvey, 438 F.3d 404, 426-27 (4th Cir. 2006). "A motion to amend is futile, and thus should be denied, if the proposed amendment is clearly insufficient because of substantive or procedural considerations." Costello v. Univ. of N. C. at Greensboro, 394 F. Supp. 2d 752, 756 (M.D.N.C. 2005). Lynch

17

argues the Trustee's motion should be denied because of failure to comply with Local Rule 7.3[12], prejudice, and futility. The Court agrees that allowing the proposed amendments would be futile.

In addition to removing any allegations relevant to the Trustee's claims against 71st Partners, the proposed amendments clarify that 71st Partners has now been dismissed, (proposed Second Am. Compl. ¶ 6), clarify the transfer of Mrs. Boex's shares in Carolinas Corporation, (id. ¶ 16), state the absence of a petition under Chapter 15 of the Bankruptcy Code, (id. ¶ 30), remove the purported Second Claim for Relief requesting a denial of any equitable relief, move the allegations from the First Claim for Relief against 71st Partners to a new factual paragraph, (id. ¶ 60), add allegations pertaining to Lynch's fee, (id. ¶¶ 62, 64, 65, 65A, 70, 75, 87, 88, 89), and renumber the claims for relief. None of these proposed amendments changes the analysis of the application of foreign official immunity or the conclusion that Lynch is protected by such immunity. Therefore, the Trustee's motion to amend is denied.

---

[12] While Local Rule 7.3(j) requires a motion to amend to "state good cause" and "cite any applicable rule, statute, or other authority justifying the relief sought", the Trustee's failure to do so does not doom its motion. The Trustee moved to amend after the Court, during a hearing on February 2, 2018, afforded it the opportunity to do so. Therefore, any failures to abide by the directives of Local Rule 7.3(j) are harmless, particularly in light of the proposed amendments and the finding that such amendments are futile.

IV.

For the reasons stated herein, IT IS HEREBY ORDERED that Plaintiff's Motion Seeking Authority to Amend Complaint [Doc. #19] is DENIED.  IT IS FURTHER ORDERED that Defendant's Motion to Dismiss Amended Complaint [Doc. #5-1] is GRANTED.  A judgment dismissing this action with prejudice will be filed contemporaneously with this order.

This the 8th day of August, 2018.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge